UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | **Demand for Jury Trial** |
| v. | |
| FLORIDA ANESTHESIOLOGY & PAIN CLINIC, P.A. and RAVI XAVIER, M.D., | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.     <u>INTRODUCTION</u>

1.     This is a case about a pain management clinic and its owner who engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail seeking to collect payment from Allstate for medical services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

1

3.      All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

4.      Because the defendants' fraud was so pervasive and potentially placed patients in grave danger, Allstate reached out to the defendants before filing this Complaint to put a stop to the fraud as soon as possible.

5.      Allstate entered into a binding settlement agreement with the defendants on December 8, 2023 resolving its claims of fraud by the defendants.

6.      The defendants have already breached that settlement agreement.

7.      By this Complaint, Allstate brings an action for breach of contract seeking both damages and specific enforcement of the settlement agreement between the parties.

8.      In the alternative, and as detailed in each count set out below, Allstate brings this action on the underlying fraud committed by the defendants that led to the December 8, 2023 settlement agreement, including counts for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c); (2) violations of the Florida RICO Act, Fla. Stat. § 772.103; (3) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213; (4) common law fraud; and, (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by and on behalf of the defendants are compensable.

9.      As a result of the defendants' fraudulent acts, Allstate has paid millions of dollars to resolve insurance claims that were based on the false, fabricated, unlawful, and improper medical services at issue in this Complaint.

II.     **THE PARTIES**

A.     **PLAINTIFFS**

10.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

11.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

12.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Florida.

B.     **DEFENDANTS**

1.     **Florida Anesthesiology & Pain Clinic, P.A.**

13.     Defendant Florida Anesthesiology & Pain Clinic, P.A. ("Florida Anesthesiology") is organized under the laws of the State of Florida, with its principal place of business in Palm Beach Gardens, Florida.

14.     At all relevant times, Florida Anesthesiology was operated and conducted by defendant Ravi Xavier, M.D. ("Xavier").

15.     Florida Anesthesiology billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

2.     **Ravi Xavier, M.D.**

16.     Defendant Ravi Xavier is a resident and citizen of the State of Florida.

17.     At all relevant times, Xavier operated and controlled defendant Florida Anesthesiology.

### III.     JURISDICTION AND VENUE

18.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over this action relating to the underlying claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

20.     Supplemental jurisdiction over the plaintiffs' underlying state law claims is proper pursuant to 28 U.S.C. § 1367.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas a substantial part of the acts at issue in this Complaint were carried out within the Southern District of Florida.

### IV.     THE SETTLEMENT AGREEMENT AND BREACH OF THE SAME BY THE DEFENDANTS

22.     As set out in the sections below detailing the factual bases for Allstate's alternative causes of action (e.g., RICO violations, fraud, violations of the FDUTPA, and unjust enrichment), the defendants committed pervasive and serious fraud that injured not only Allstate, but also placed patients and Allstate insureds and claimants at grave risk from grossly incompetent and dangerous alleged medical "treatment" by the defendants.

23.     Once Allstate discovered this fraud, Allstate moved quickly to stop the fraudulent bills submitted to it by the defendants and to protect patients of the defendants.

24.     Allstate contacted the defendants about their fraud and Allstate's concerns about patient safety, which led to an in-person mediation between the parties on November 28, 2023.

25.     On the morning of December 8, 2023, Allstate and the defendants reached an agreement that was binding on all parties named in this Complaint and that resolved the fraud- and unjust enrichment-based claims alleged herein (the "Settlement Agreement.").

26.     The material terms of the Settlement Agreement are that (1) the defendants, jointly and severally, shall pay $2,500,000 to Allstate, with a $1,000,000 initial payment followed by monthly installment payments; (2) these payments are secured by an agreed/pocket judgment for $3,000,000 (less any payments already made) in the event of the defendants' failure to pay; (3) waiver by the defendants of all outstanding bills and claims for payment submitted to Allstate and for which Allstate is the responsible payor; and (4) a prohibition on the defendants billing Allstate or its insureds and claimants and not seeking payment from Allstate and Allstate's insureds and claimants until all payments due under the Settlement Agreement have been made.

27.     There is no dispute that the parties reached a binding agreement and that the material terms are as set out in the preceding paragraph.

28.     However, on December 19, 2023, the defendants advised Allstate that they will not comply with the payment term of the Settlement Agreement and the defendants, in fact, have not complied with the payment term of the Settlement Agreement, including not making the initial payment of $1,000,000.  The defendants have not paid any amount to Allstate.

29.     The defendants were unequivocal and absolute that they will not comply with the terms of the Settlement Agreement, as confirmed by numerous telephone conversations between counsel for Allstate and counsel for the defendants on December 19, 2023 and the days thereafter during which counsel for the defendants apologized but stated numerous times that he was instructed by the defendants to convey that the defendants will not honor their Settlement Agreement obligations.   In fact, the defendants have not honored the Settlement Agreement

requirements, including not tendering any payment to Allstate.  Thus, by both verbal statements and actual (lack of) action, the defendants have confirmed that they have repudiated their duties under the Settlement Agreement, have not met their obligations and duties under the Settlement Agreement, and have no intention to meet their obligations and duties under the Settlement Agreement.

30.     As such, the defendants are in breach of the Settlement Agreement.

31.     Allstate is damaged by this breach because it has not received payment from the defendants nor have the defendants complied with the other material terms of the Settlement Agreement, including not waiving their bills/claims.

32.     Because the defendants breached the Settlement Agreement and have failed to cure that breach, Allstate is entitled to immediate entry of the agreed/pocket judgment for $3,000,000 payable by the defendants jointly and severally, as well as to specific performance of the defendants' waiver of their outstanding bills/claims and the defendants' promise not to pursue future bills/payment from Allstate until all of their payment obligations to Allstate are complete.

33.     Allstate is entitled to specific enforcement of these terms of the Settlement Agreement as they pertain to bills and claims that have not yet been submitted to Allstate as well as to future conduct by the defendants.  Because the defendants' future conduct cannot be determined in advance, the value of these enforceable promises cannot be adequately replaced by money damages.

## V.     BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

34.     The defendants' fraud that led to the Settlement Agreement was pervasive and serious, as detailed in the instant and the succeeding sections of this Complaint.  Allstate sets out the factual allegations detailing the defendants' fraud (and the concomitant legal causes of action

based on RICO violations, fraud, FDUTPA violations, and unjust enrichment) as an alternative request for relief to the breach of contract allegations and count based on the defendants' breach of the Settlement Agreement.

35.     The defendants are a pain management clinic, Florida Anesthesiology, and its owner, Xavier, who also operates the clinic and is its sole physician.

36.     All of the bills submitted to Allstate by and on behalf of Florida Anesthesiology claim that Xavier was the physician who rendered the alleged services.

37.     The defendants targeted patients who claim to have been involved in automobile accidents in order to bill insurance companies like Allstate outrageous sums for alleged treatment and procedures that were fraudulent, medically inappropriate, unnecessary, excessive, and, in many instances, not performed at all.

38.     If the defendants actually performed all the procedures they billed in the manner they claimed, the lives of the patients at issue herein were placed at risk.

39.     As detailed below, Florida Anesthesiology regularly billed for alleged injections into patients' spines using body positioning, approaches, and medications that were contraindicated, physiologically impossible, and extremely and unnecessarily dangerous.

40.     Florida Anesthesiology billed for these alleged injections and other procedures solely to generate as large a bill as possible as quickly as possible to inflate the perceived value of insurance claims.

41.     The defendants maintained agreements with several law firms who sent their clients to the defendants because the defendants agreed to and did in fact generate enormous charges regardless of patients' actual injuries (if any), which charges were used to increase the perceived value of insurance claims and extract payments from Allstate.

42.     The patients at issue herein were seeking little or no medical treatment on their own before they were steered by layperson attorneys to the defendants in order to bolster the perceived value of their insurance claims.

43.     The defendants' bills were often presented to Allstate for the first time by the defendants' law firm associates as exhibits to demands seeking all or nearly all of the limits of coverage provided by Allstate's insurance policies.

44.     Because the defendants' bills and records were intended to appear valid on their face, and because Allstate and its insureds could face substantial liability for rejecting a valid demand, the defendants and their associates knew that they would induce Allstate to make payments without the opportunity to conduct meaningful investigation to discover the fraud discussed herein.

45.     The defendants' fraudulent bills and records were designed to be, and in fact were, a substantial factor inducing Allstate to make payments that would not have been paid but for the fraudulent bills by the defendants.

46.     The defendants were at all times aware that the personal injury attorneys to whom they sent their bills and records would in turn mail them to Allstate to demand insurance payments, and that proceeds of such insurance payments would be mailed to the personal injury attorneys and disbursed for the financial benefit of the defendants.

47.     Absent the fraudulent bills from the defendants, the bills and records transmitted to Allstate would have documented primarily conservative treatment and medical expenses that totaled far less than policy limits, and Allstate would not have paid the amounts it was induced to pay pursuant to the scheme described herein.

48.     Upon information and belief, the defendants expected and arranged to be compensated by their personal injury attorney associates at rates that were far less than the amounts represented to be their charge amounts in the records and bills mailed to Allstate.

49.     Florida Anesthesiology billed primarily for alleged spinal procedures and injections.

50.     Florida Anesthesiology billed for an incredible number of automated percutaneous discectomies ("PDDs") despite the fact there is little evidence to support the efficacy of this procedure.

51.     An automated PDD is only medically necessary, if ever, when a patient has persistent and severe pain that has resisted all other attempts at alleviation.

52.     The defendants, however, frequently billed for PDDs – at a rate of $65,000 for each medically unnecessary PDD – to patients before attempting any other treatment, including at patients' initial appointments.

53.     Florida Anesthesiology also frequently billed for radiofrequency ablations ("RFAs"), which are procedures that destroy nerves thought to cause facet joint pain by burning the nerves with radio waves.

54.     Before destroying nerves with RFA procedures, physicians need to identify the actual suspected source of pain, which is typically done using diagnostic medial branch blocks ("MBBs") that temporarily numb the nerve to confirm that a particular facet joint is indeed the source of a patient's pain.

55.     Florida Anesthesiology, however, routinely skipped MBBs entirely and instead immediately billed for the more expensive RFA procedures without regard for the fact that patients' healthy nerves were being unnecessarily destroyed.

56.     Florida Anesthesiology frequently billed for as many as five (5) RFAs on the same date, and up to ten (10) RFAs per patient, destroying nerves in large areas of patients' spines.

57.     Because Florida Anesthesiology did not make efforts to actually determine which facet joints, if any, were the source of patients' claimed pain, it maximized its charges by indiscriminately billing for a large number of RFAs to numerous facet joints, some or all of which contained healthy nerves.

58.     The third type of procedure commonly billed by Florida Anesthesiology were epidural steroid injections ("ESIs") that are used to treat radicular pain caused by a compressed nerve in a patients' spinal column.

59.     ESIs are appropriate when used to treat pain that has not improved with conservative attempts at management such as physical therapy, but these injections are subject to limitations as to how many may be given in a single day and how frequently they should be used.

60.     Florida Anesthesiology routinely billed for excessive steroid injections that far exceeded standards of care on how many can be given per day and also billed for repeating these injections far too quickly.

61.     Even more egregiously, Florida Anesthesiology frequently billed for ESIs on the same days it also billed for unnecessary RFAs and PDDs, which can never be medically appropriate.

62.     Administering multiple treatments on the same date is redundant and the diagnostic value of each is lost because it is impossible to tell which might have caused any relief experienced by the patient.

63.     PDDs should only be attempted after treatments like ESIs have failed, and certainly not on the same day.

64.     RFAs treat a completely different source of pain (axial, facet joint pain) than ESIs (radicular, pinched nerve pain).

65.     Billing for both ESIs and RFAs to the same spinal region on the same date is evidence that the treatments, if done at all, were not a serious attempt by the defendants to diagnose and treat patients' alleged pain.

66.     To create the appearance of support for these unnecessary, unsafe, and fraudulent procedures, Florida Anesthesiology created fabricated medical records that exaggerated patients' pain and invented symptoms such as radicular pain and numbness.

67.     Florida Anesthesiology's fabricated records also included remarkably incorrect vital statistics for patients that suggest that patients were not actually ever seen or treated by the defendants, such as height measurements that differ by a half a foot and weight measurements that differ by more than 100 pounds from those recorded by other providers treating the same patient.

68.     According to Florida Anesthesiology, Xavier claimed to perform procedures, including PDDs, by himself with no assistants or witnesses and using only local anesthesia, sometimes with sedation, that he claimed to administer himself.

69.     Often, after these alleged significant procedures billed by Florida Anesthesiology, subsequent physicians treating the patients made no mention of them having ever been performed despite listing other treatments by other providers, which again suggests that patients were not actually ever seen or treated by the defendants.

70.     The defendants transmitted bills and associated records for their purported services to their personal injury attorney associates, whom the defendants knew would send them to Allstate through the U.S. Mail.

71.     The defendants were aware that Allstate would rely, and Allstate did in fact rely, on these fraudulent bills and records in adjusting and paying insurance claims.

## VI.     BILLING FOR SERVICES NOT RENDERED

72.     The defendants regularly billed for services, treatment, and testing that were never rendered to the patients at issue herein.

73.     All of the bills submitted by and on behalf of the defendants to Allstate through the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

### A.     BILLING FOR DISCECTOMIES NOT PERFORMED

74.     Florida Anesthesiology billed for an incredible number of alleged PDD surgeries, despite the fact that this type of surgery is rarely performed by other practitioners due to its lack of proven efficacy.

75.     Most private health insurers consider PDDs to be unproven and will not cover them, and the Centers for Medicaid and Medicare Services ("CMS") does not recognize or cover the type of PDD regularly billed by Florida Anesthesiology.

76.     If these types of PDD procedures are ever medically necessary, they would only be for persistent, discogenic pain that had resisted treatment by methods that are supported by valid clinical evidence.

77.     Florida Anesthesiology routinely billed for PDDs at patients' first evaluations or only shortly thereafter, before the success or failure of other interventions could be determined or even attempted.

78.     Florida Anesthesiology frequently billed for these alleged procedures because it charged enormous fees by cultivating the appearance that PDDs were complex spinal surgeries.

79.     In reality, PDDs are a minimally invasive procedure that are easily performed on an outpatient basis using a needle-like tool that leaves only a small, circular mark that looks very similar to the mark that would be left by other procedures for which Florida Anesthesiology routinely billed, such as ablations and steroid injections.

80.     Florida Anesthesiology invariably claimed that Xavier alone performed these alleged PDDs, and that he also acted as the anesthesiologist if the patient was purportedly sedated.

81.     Florida Anesthesiology never identified any nurses, staff, or other assistants who were present for these alleged procedures and, accordingly, there were no apparent witnesses to these alleged procedures.

82.     If Xavier did perform surgeries with sedation as both the surgeon and the anesthesia provider, he did so in violation of Florida law.

83.     Pursuant to Florida Administrative Code 64B8-9.009(4)(b)(4) ("Standard of Care for Office Surgery"), when performing a surgery that utilizes sedation, "[t]he surgeon must be assisted by a qualified anesthesia provider," and "[a]n assisting anesthesia provider cannot function in any other capacity during the procedure."

84.     Florida Anesthesiology also never disclosed where the alleged surgeries supposedly took place, but rather listed all six (6) of its addresses on each record submitted to Allstate.

85.     Several of the patients at issue in this Complaint were examined by separate physicians after allegedly having a PDD billed by Florida Anesthesiology, and often those subsequent physicians made no mention of the patient having undergone a PDD despite recounting other prior treatments that were more minor and less invasive.

86.     Although a PDD is a minimally invasive procedure, it was still the most invasive treatment most patients allegedly had and it would be extraordinary for a patient to recount to a subsequent physician all of their lesser treatments but not a surgical procedure.

87.     In several cases, these subsequent physicians performed further surgical intervention or radiology and did not note any anatomical change from the alleged PDD billed by Florida Anesthesiology.

88.     Taken together, this evidence of unwarranted, unwitnessed, incompletely recorded, and not subsequently disclosed alleged PDDs regularly billed by Florida Anesthesiology confirms that these procedures were not actually performed as billed, if any procedure was performed at all.

89.     As an example, patient B.G. (Claim No. 0658591458)[1] testified to her experience and confirmed that most of the alleged treatment billed by Florida Anesthesiology was never performed.

90.     Over the course of just two (2) dates of service, Florida Anesthesiology billed for an incredible amount of treatment to B.G., including six (6) ESIs and five (5) RFAs on July 18, 2022, and two (2) PDDs and another three (3) ESIs just one week later on July 25, 2022.

91.     B.G. testified that she did indeed have two (2) appointments at Florida Anesthesiology, but that the only treatment she received was two (2) injections on each date for a total of four (4) injections.

92.     B.G. stated that Xavier never even spoke to her about surgery or the removal of disc material (a PDD) or about cauterizing of nerves (an RFA).

_____

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

93.     When B.G. was asked if she received the informed consent warnings concerning PDDs that Florida Anesthesiology claimed to give her, including the risks of paralysis, seizure, blood clots, and death, she stated unequivocally that she had never been given such warnings.

94.     B.G. further testified that she was opposed to having any kind of back surgery because one of her close friends had a very bad experience with such a surgery.

95.     B.G. also explained that she hates needles and that she nervously asked Xavier questions as he prepared each of her injections, which further confirms that she was cognizant of the services that were actually performed.

96.     Finally, B.G. testified that these injections took approximately fifteen (15) minutes for each set of two (2).  A PDD could not be performed in such a short amount of time.

97.     The two (2) PDDs and five (5) RFAs billed by Florida Anesthesiology were never performed and even if any injections B.G. recalls having were ESIs (which is also unlikely, for the reasons discussed herein), she still received fewer than half of the ESIs for which Florida Anesthesiology billed.

98.     As another example, patient C.V. (Claim No. 0623562329) saw a number of different providers for his complaints of back and neck pain after an alleged motor vehicle accident, including a course of chiropractic treatment, cervical facet blocks from a separate pain management provider, and cervical radiofrequency ablations.

99.     C.V. then presented to Florida Anesthesiology on June 21, 2022, which immediately billed $140,000 for two alleged PDDs during C.V.'s very first appointment, one each in the cervical and lumbar regions.

100.     Xavier, who allegedly performed the PDD, had never before examined C.V. and falsely stated in his records that C.V. had obtained short-term relief from ESIs in order to create the appearance of justification for performing PDDs to the same regions.

101.     In reality, C.V. never had ESIs but only cervical facet blocks and RFAs, which both target facetogenic rather than discogenic pain (the latter of which is what is targeted by ESIs and PDDs).  C.V. had no prior injection treatment at all for his lumbar spine.

102.     At his second and final alleged appointment at Florida Anesthesiology just six (6) days later, which Florida Anesthesiology falsely billed as an initial examination, it was claimed that the PDDs worked and that C.V. did not need any injections at that time.

103.     Just three (3) weeks later, C.V. presented to an orthopedist, where C.V. reported the same or worse pain scores than he had reported prior to the alleged PDDs.

104.     At two (2) separate evaluations, the orthopedist listed all of C.V.'s prior treatments, including chiropractic treatment, injections, and RFAs, but said nothing about any prior PDDs, which were the most recent and aggressive treatment C.V. allegedly received.

105.     After the second evaluation, the orthopedist stated that C.V. was a candidate for a discectomy surgery similar to what Florida Anesthesiology claimed to have already done, but again made no reference to or acknowledgment of the alleged similar procedure billed just weeks earlier.

106.     The orthopedist, however, stated that any surgery would need to be performed at an in-patient facility with around-the-clock post-surgical care due to C.V.'s heart condition, the fact that C.V. was on the blood thinner Plavix, and because C.V.'s cardiologist would not clear him for outpatient surgery.

107.    Florida Anesthesiology made no mention of C.V.'s cardiac condition or prescription for blood thinners, and claimed to have performed its PDD surgeries on an outpatient basis.

108.    Apart from Florida Anesthesiology's ridiculous bill seeking $140,000 for procedures that were not indicated, which was accompanied by a medical record rife with inaccuracies, there is no evidence that PDDs were actually performed at all on C.V.

109.    Indeed, if Florida Anesthesiology had actually performed PDDs on C.V. as claimed, it placed him in serious life-threatening danger by performing outpatient surgery on a patient whose significant medical history was never acknowledged or addressed.

110.    Similarly, and as another representative example, Florida Anesthesiology billed for two (2) PDDs to S.M. (Claim No. 0660976614) on the same day, one in the cervical spine and one in the lumbar spine.

111.    Three (3) months later, another surgeon billed for similar procedures to S.M. on the same two (2) levels of his cervical and lumbar spine, but made no mention of any prior surgery to those spinal levels, and his procedure notes say nothing about observing signs of prior surgery.

112.    Florida Anesthesiology billed for an alleged PDD to C.S.'s (Claim No. 0635695397) lumbar spine on January 17, 2022.

113.    Just two days later, on January 19, 2022, C.S. had an appointment with his chiropractor who made regular notes on C.S.'s progress and made no mention whatsoever of a lumbar surgery that took place just two days earlier.

114.    The chiropractor also billed for performing his usual chiropractic manipulation to C.S.'s lumbar spine along with electrostimulation to the same area and mechanical traction, all of

which would have been contraindicated if C.S. had really undergone a surgery just two (2) days prior.

115.    Remarkably, Florida Anesthesiology almost always claimed to perform PDDs on the same spinal levels of its patients: in the cervical spine at C4-5 and C5-6 and in the lumbar spine at L4-5 and L5-S1.

116.    It is not possible that all of Florida Anesthesiology's patients would need PDD surgery at the exact same spinal levels.

117.    Indeed, as explained more fully *infra*, magnetic resonance imaging ("MRI") results confirm that many of these patients did not have herniated discs or suspected nerve compression at the levels where Florida Anesthesiology claimed to perform discectomies.

118.    Not only did Florida Anesthesiology bill for discectomies that were not performed at all, it also routinely billed for "add-on" endoscopic decompressions that were never performed.

119.    Whenever Florida Anesthesiology billed for an alleged PDD, it also routinely billed a separate charge for alleged endoscopic decompression and excision of herniated discs.

120.    Florida Anesthesiology's own descriptions of the procedures for which it billed confirm that endoscopic equipment was not used.

121.    The discectomies billed by Florida Anesthesiology claimed to utilize a needle-like "Dekompressor"[2] to remove disc material percutaneously without an open incision.

122.    An endoscopic procedure is a subset of percutaneous procedures that utilizes a camera to view the surgical area.

---

[2] A Dekompressor is a brand name for a tool manufactured by Stryker Corporation.

123.     The procedures described and billed by Florida Anesthesiology did not require any endoscopic equipment, and Xavier never utilized any such equipment, despite Florida Anesthesiology billing for its use at least 80 times since 2019.

**B.     BILLING FOR ABLATIONS NOT PERFORMED**

124.     Florida Anesthesiology frequently billed for administering five (5) RFAs to a single patient at a time.

125.     For the lumbar spine, five (5) RFAs constitute purported treatment at every vertebral level.

126.     When billing for cervical RFAs, Florida Anesthesiology always claimed to treat the same five (5) levels: C1-2 through C5-6.

127.     The notion that all of Florida Anesthesiology's patients needed RFAs to the same ten (10) spinal levels is simply not credible.

128.     Moreover, Florida Anesthesiology nearly always billed for administering ESIs on the same date as RFAs and usually in the same spinal region.

129.     As described more fully *supra*, Florida Anesthesiology billed for five (5) lumbar RFAs to patient B.G. (Claim No. 0658591458) on July 18, 2022.  B.G. testified that none of these RFAs ever took place.

130.     Similarly, Florida Anesthesiology billed for five (5) lumbar RFAs to patient A.W. (Claim No. 0698774270) on March 20, 2023, along with six (6) ESIs on the same date.  A.W. testified that the only treatment he ever received from the defendants was a single spinal injection.

131.     As with the PDDs described above, patients for whom Florida Anesthesiology billed these ridiculously excessive procedures, along with their subsequent physicians, often had no idea that they were done.

132.     As one example, Florida Anesthesiology billed for five (5) alleged RFAs to patient T.T. (Claim No. 0513021865) at cervical levels C1-2 through C5-6 on August 10, 2019 (along with several ESIs, including to the same vertebral levels).

133.     Three months later, T.T. saw another physician who diagnosed her with facetogenic pain and recommended performing MBBs.

134.     This physician (and apparently also the patient) was unaware that Florida Anesthesiology had allegedly already performed RFAs, including at the same C5-6 vertebral level.

135.     Moreover, if Florida Anesthesiology had performed these RFAs as billed, repeating RFAs just three (3) months later would not have been appropriate as the cauterized nerves would not have had time to regrow.

### C.     BILLING FOR STEROID INJECTIONS NOT PERFORMED

136.     Florida Anesthesiology also billed for alleged ESIs that would have been nearly impossible and extremely dangerous to perform in the manner described by Xavier.

137.     Specifically, Florida Anesthesiology regularly billed for allegedly performing cervical transforaminal steroid injections to patients lying in the prone position.

138.     In the prone position, patients lie face down on a flat surface.  Most ESIs are delivered with the patient in this position because it allows the physician access to the patient's spine.

139.     A cervical transforaminal injection, however, uses an anterior approach to place the needle at the nerve root of the patient's vertebra.  If the patient is prone, the boney structure of the vertebrae obscures the needle's approach making it impossible to visualize proper placement.  For that reason, this particular ESI is administered with patients in a supine position.

140.    If Florida Anesthesiology actually performed these injections in the prone position, contrary to standards of care and in reckless disregard for patient safety, it did so without properly visualizing needle placement near the patient's spinal column.

141.    The danger caused by Florida Anesthesiology's alleged approach for these procedures is compounded by the fact that it claimed to use the particulate steroid Kenalog.

142.    The FDA has warned that Kenalog is not approved for ESIs because it can result in stroke and death if it embolizes to an artery.

143.    The placement of the needle during a cervical transforaminal ESI is exceedingly close to the vertebral artery, as well as feeding arteries to the spinal cord, the spinal segmental artery, and the radicular artery.

144.    If the Kenalog that Florida Anesthesiology claimed to inject embolized to any of these three arteries, it could cause a stroke, and if Xavier could not properly visualize placing the needle because patients were improperly in the prone position, the risk was greatly magnified.

145.    That no patients at issue in this Complaint appear to have been severely injured or killed by Florida Anesthesiology is alone evidence that these injections were not performed as billed.

146.    Another indication that Florida Anesthesiology did not really provide the ESIs for which it billed is that it nearly always claimed to do cervical ESIs in sets of three (3), and nearly always to the same three (3) levels, namely C4-5, C5-6, and C6-7.

147.    It is extremely unlikely that Florida Anesthesiology's patients would always require exactly three (3) cervical transforaminal ESIs to the same three (3) spinal levels.

148.    The following are ten (10) representative examples of Florida Anesthesiology billing for cervical transforaminal ESIs that were extraordinarily dangerous if they were done and almost certainly were not actually performed as billed:

 a. May 4, 2020, I.R. (Claim No. 0578244303), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 b. July 11, 2020, A.M. (Claim No. 0577427263), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 c. October 31, 2020, F.D. (Claim No. 0578246274), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 d. February 8, 2021, J.S. (Claim No. 0597691096), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 e. January 17, 2022, C.S. (Claim No. 0635695397), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 f. March 2, 2022 and March 16, 2022, N.C. (Claim No. 0651216434), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog;

 g. July 16, 2022, O.Z. (Claim No. 0669263989), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog; and

 h. April 1, 2023 and April 22, 2023, J.M. (Claim No. 0703287557), three (3) cervical transforaminal ESIs to levels C4-5, C5-6, and C6-7 allegedly done in the prone position using Kenalog.

## VII. IMPROPER PATIENT REFERRAL ARRANGEMENTS

149.    The defendants' relationships with their personal injury attorney referral sources directly and intentionally led to the bills for medically unnecessary and excessive services detailed herein.

150.    The referral of alleged accident victims to the defendants bore no relation to the medical necessity of evaluation or treatment of the patients at issue in this Complaint, who would not have sought treatment but for the improper referrals.

151.    Attorneys referred their clients to Florida Anesthesiology because they knew that it would produce artificially high medical bills that could be used to extract large payment from Allstate and in turn larger contingency fees for the attorneys.

152.    The defendants provided these fraudulent bills to their attorney referral sources in order to obtain additional patients and to collect a portion of those bills from insurance proceeds.

153.    Treatment for which generating bills to inflate the value of insurance claims is a motivating factor is fraudulent and non-compensable, and Allstate is entitled to repayment for all amounts it was induced to pay by the defendants' submission of such bills.

154.    Florida Anesthesiology expressly focused its advertising on plaintiff attorneys rather than patients, stating on its website that: "*We specialize in various types of on-site testing and procedures that will assist in building a strong case for your clients . . . .*"

155.    One of the law firms that frequently referred patients to Florida Anesthesiology, Steinger, Iscoe, & Greene, P.A (now Steinger, Greene, & Feiner, P.A), has previously been linked to improperly forcing its clients to undergo unnecessary surgeries.

156.    Steinger, Iscoe, & Greene, P.A unwound in 2019 amid a public dispute and contentious lawsuits between its partners in which Steinger and others were accused by two former associates of sharing profits with "runners" who unlawfully brought them clients.

157.    Steinger was also accused of instituting a "no surgery, no case" rule to force clients to have expensive surgery.[3]

158.    This practice has clearly continued with referrals of patients to Florida Anesthesiology, which, as detailed herein, immediately billed tens (sometimes hundreds) of thousands of dollars for alleged surgeries and invasive procedures at initial visits and made little to no effort to attempt any conservative treatment or to follow up with patients after they were used to generate bills.

## VIII.   FALSIFIED AND FABRICATED RECORDS

159.    The defendants submitted falsified and fabricated medical records to Allstate in an effort to conceal their fraud and to create the appearance of significant injury in order to support their charges submitted to Allstate for unnecessary services.

160.    The defendants regularly misrepresented radiological findings to justify unnecessary surgeries and ablations.

161.    The defendants also regularly used pattern language that was cut and pasted between patients to give false and exaggerated descriptions of injuries and symptoms.

162.    Xavier has previously been disciplined by the Florida Board of Medicine for failing to properly maintain medical records.

163.    In 2011, the Florida Department of Health filed an administrative complaint against Xavier after an ESI that he attempted to administer resulted in a dural tear in his patient's spinal cord leading to a leak of cerebrospinal fluid.

---

[3] *See* Jane Musgrave, *Break-up of Steinger, Iscoe & Greene reads like a Grisham novel*, THE PALM BEACH POST, February 15, 2019, 1:54 pm ET, available at: https://www.palmbeachpost.com/story/news/crime/2019/02/15/steinger-iscoe-and-greene-break-up-reads-like-john-grisham-novel/53211625007/

164. The Department of Health alleged that Xavier committed medical malpractice as well as failing to maintain proper records, including records of the botched procedure at issue, proof of informed consent, pre-operative records, and records showing spinal stenosis to justify the procedure in the first place.

165. Xavier entered into a settlement agreement that accepted the failure to maintain records and received a fine and a letter of concern from the Florida Board of Medicine.

166. Despite this disciplinary history, Xavier has continued to disregard proper medical record requirements, including by copying and pasting and otherwise fabricating the records submitted to Allstate to justify Florida Anesthesiology's billing for unnecessary and dangerous treatment.

### A.    FABRICATED, BOILERPLATE PATIENT COMPLAINTS

167. The defendants used boilerplate descriptions of complaints and symptoms that were near exact reproductions between different patients' medical records with only minor variations.

168. These boilerplate descriptions were false and intended to justify unnecessary and pre-determined treatment regardless of patients' actual medical status.

169. By way of example, the following are nearly identical descriptions of neck pain and back pain allegedly experienced by four (4) different patients.

    a. Patient S.M. (Claim No. 0660976614) on May 7, 2022:

1. Neck pain described as aching burning constant dull Location diffuse radiating to head radiating to shoulder(s) associated with muscle spasms muscle stiffness numbness aggravated by sitting standing trauma/injury relieved by activity onset gradual reported as 9/10 on pain scale lasting 4 hours occurs every 4 hours

2. Back pain achy in nature burning constant located in the lumbar region at the sacrum with other symptoms of muscle spasms muscle stiffness numbness aggravated by sitting standing walking relieved by activity gradual in occurrence pain rated as 8/10 on the pain scale lasting 4 hours every 4 hours

b.   Patient C.V. (Claim No. 0623562329) on June 21, 2022:

1. Neck pain described as aching, burning, constant; Location at the midline, diffuse, radiating to head, radiating to shoulder(s); associated with muscle spasms, muscle stiffness, numbness; aggravated by sitting, standing, trauma/injury; relieved by activity; onset gradual; reported as 9/10 on pain scale; lasting 4 hours; occurs every 4 hours
2. Back pain achy in nature, burning, constant, dull; located in the lumbar region, at the sacrum; with other symptoms of muscle spasms, muscle stiffness, numbness; aggravated by sitting, standing, walking; relieved by activity; gradual in occurrence; pain rated as 9/10 on the pain scale; lasting 4 hours; every 4 hours.

c.   Patient B.G. (Claim No. 0658591458) on July 18, 2022:

1   Neck pain described as aching  burning  constant  Location diffuse  radiating to head  radiating to shoulder(s)  associated with muscle spasms  muscle stiffness  numbness  aggravated by sitting  standing  trauma/injury  relieved by activity  onset gradual  reported as 9/10 on pain scale  lasting 4 hours  occurs every 4 hours
2   Back pain achy in nature  burning  constant  located in the lumbar region  at the sacrum  with other symptoms of muscle spasms  muscle stiffness  numbness  aggravated by sitting  standing  walking  relieved by activity  gradual in occurrence  pain rated as 9/10 on the pain scale  lasting 4 hours  every 4 hours

d.   Patient F.J. (Claim No. 0671685717) on August 3, 2022:

**Chief Complaint:**
1. **Neck pain described as aching, burning, constant, dull; Location diffuse, radiating to head, radiating to shoulder(s); associated with muscle spasms, muscle stiffness, numbness; aggravated by sitting, standing, trauma/injury; relieved by activity; onset gradual; reported as 9/10 on pain scale; lasting 4 hours; occurs every 4 hours**
2. **Back pain achy in nature, burning, constant; located in the lumbar region, at the sacrum; with other symptoms of muscle spasms, muscle stiffness, numbness; aggravated by sitting, standing, walking; relieved by activity; gradual in occurrence; pain rated as 9/10 on the pain scale; lasting 4 hours; every 4 hours.**

170.   This same copied-and-pasted purported description of presenting symptoms was repeated verbatim or with only minor variations for the majority of the patients at issue in this Complaint.

171.   The defendants also used copied-and-pasted language to describe symptoms and create the appearance of medical necessity for the specific procedures that Florida Anesthesiology billed.

172.   For example, when billing for RFAs, the defendants always used the following language as purported justification: "The patient is presenting with new onset facetogenic pain as

26

elicited by painful facet movements in the back.  We are going to proceed with facet ablation. Clinic exams support the side and locations of the facetogenic pain."

173.    In many cases, patients had longstanding alleged complaints of spinal pain that could not possibly be characterized as "new onset," and the inclusion of this language with respect to every patient is evidence that the defendants did not actually make independent findings that procedures were appropriate for individual patients before using them to generate massive amounts of charges.

174.    In some cases, patients' pain was invented entirely.

175.    A.W. (Claim No. 0698774270) testified that during his one (1) appointment at Florida Anesthesiology on March 20, 2023, he made no complaints of lower back pain at all.

176.    Florida Anesthesiology, however, claimed that A.W. had lower back pain of nine (9) out of ten (10) using the same boiler plate language described above:

Back pain achy in nature, burning, constant, dull; located in the lumbar region, at the sacrum; with other symptoms of muscle spasms, muscle stiffness, numbness; aggravated by sitting, standing, walking; relieved by activity; gradual in occurrence; pain rated as 9/10 on the pain scale; lasting 4 hours; every 4 hours.

177.    Florida Anesthesiology claimed that A.W. suffered from "new onset facetogenic pain as elicited by painful facet movements in the back"  and further claimed "[t]he Patient [sic] has suffered from chronic disabling pain which has caused psychological, social, and physical impairment" to create the appearance of justification for the alleged RFAs to A.W.'s lumbar region.

178.    To justify alleged lumbar ESIs on that same date, Florida Anesthesiology falsely stated that "The patient is seen complaining of low back pain which is radicular in nature" and that A.W.'s "Range of motion is limited and painful."

179.    The defendants' ubiquitous use of copied-and-pasted fabrications is also evidenced by the internal inconsistencies that these falsified records create.

180.   For example, in the boilerplate language copied above, the defendants nearly always claimed that patients had both back and neck pain of nine (9) out of ten (10) to create the appearance that invasive procedures were warranted.

181.   However, in other documents (and sometimes in the same record), the reported severity of patient pain differed significantly.

182.   As just one example, on July 11, 2020, Florida Anesthesiology reported that patient A.M. (Claim No. 0577427263) had both back and neck pain of nine (9) out of ten (10) using Xavier's usual boilerplate description, but later, in explaining why the patient purportedly needed ESIs, claimed that A.M. had neck pain of seven (7) and lumbar pain of six (6).

183.   These misrepresentations were intentional and designed to increase the perceived value of insurance claims and create the appearance of justification for the predetermined procedures billed by Florida Anesthesiology.

**B.   FALSIFIED RADIOLOGY RESULTS**

184.   In addition to falsifying patient symptoms, Florida Anesthesiology also routinely misrepresented the results of diagnostic radiology to justify the procedures for which it billed.

185.   If, for an example, an MRI did not show a condition that would support a procedure billed, the defendants nevertheless falsely claimed that it did.

186.   The defendants also used copied wording when describing MRI results that were nearly identical across patients.

187.   The defendants misrepresented that numerous patients had nearly identical MRI findings in one or both of their lumbar or cervical spine using the following language (with the specific levels occasionally altered):

"Large CERVICAL disc herniations at C4-C5 AND C5-C6.  Has a paracentral herniation with neuroforaminal compression;" and

"Large lumbar disc herniations at L4-L5 AND L5-S1.  Has a paracentral disc herniation with neuroforaminal compression."

188.    The inconsistent capitalization and typographical errors in the language above was copied and pasted into numerous records by Florida Anesthesiology relative to different patients, further confirming that they were non-patient-specific fabrications.

189.    The following are examples of MRI findings falsified by Florida Anesthesiology to create the appearance of necessity for treatment it billed:

a.    Patient S.M. (Claim No. 0660976614) on May 14, 2022:

injections were successful in relieving his pain short term. **Large CERVICAL disc herniations at  C4-C5 AND C5-C6,.Has a paracentral herniation with neuroforaminal compression.**

injections were successful in relieving his pain short term. **Large lumbar disc herniations at  L4-L5 AND L5-S1,.Has a paracentral herniation with neuroforaminal compression.**

In reality, the neuroradiologist who prepared and signed the MRI findings taken on March 18, 2022 stated that the C4-5 vertebral level was "unremarkable" and that the C5-6 vertebral level had a 1-2 mm herniation, which is not large, and made no mention of any neuroforaminal compression.  In fact, the neuroradiologist noted a larger 2-3 mm herniation at the C6-7 vertebral level that Florida Anesthesiology did not mention at all, further evidencing that its copied "findings" had no relation to the actual imaging results. In the lumbar spine, the radiologist found that at the L4-5 vertebral level there was a herniation, but again no neuroforaminal compression, and that the L5-S1 vertebral level had no herniation, but rather a bulging annulus, both of which were again inconsistent with Florida Anesthesiology's copied and fabricated language.  Florida Anesthesiology used these fabrications to bill more than $211,700 for alleged injections, RFAs, and PDDs over the period of just one (1) week in May 2022.

b.    Patient C.V. (Claim No. 0623562329) on June 21, 2022:

**Large CERVICAL disc herniations at  C4-C5 AND C5-C6,.Has a paracentral herniation with neuroforaminal compression.**

paraspinal spasms. Previous epidurals injections were successful in relieving his pain short term. **Large lumbar disc herniations at L3-4, L4-L5.Has a paracentral herniation with neuroforaminal compression.**

In this example, Florida Anesthesiology falsely claimed that C.V. had MRI findings, but C.V. instead had CT scans.  C.V. has a defibrillator pacemaker that is not safe for MRIs – a fact that Xavier apparently disregarded.  Moreover, those CT scans were taken a year

prior to his alleged treatment by Florida Anesthesiology.  The cervical CT scan taken on May 14, 2021 showed a protrusion at C4-5 and stenosis caused by joint and facet hypertrophy at C5-6.  The lumbar CT scans taken on August 9, 2021 showed no herniations either but rather bulging and degenerated discs.  None of the actual imaging findings could be construed to support billing for PDDs, but Florida Anesthesiology used these fabricated reports to bill more than $140,000 for that alleged procedure on the very first date it claimed to evaluate C.V.

    c.    Patient B.G. (Claim No. 0658591458) on July 25, 2022:

injections were successful in relieving his pain short term. Large CERVICAL disc herniations at  C4-C5 AND C5-C6,.Has a paracentral herniation with neuroforaminal compression.

injections were successful in relieving his pain short term. Large lumbar disc herniations at  L4-L5 AND L5-S1,.Has a paracentral herniation with neuroforaminal compression.

The MRIs of B.G. taken on March 23, 2022 showed a bulging disc at C4-5 and a herniation at C5-6, but for both levels the radiologist made no reference to foraminal compression.  A lack of foraminal compression indicates that these findings were not causing pinched nerves, and there was no need for the more than $189,000 worth of alleged injections and PDDs billed by Florida Anesthesiology over the course of just one (1) week in July 2022.  The lumbar MRI showed a completely normal L4-5 vertebral level.

    d.    Patient J.M. (Claim No. 0581136264) on May 19, 2020:

injections were successful in relieving his pain short term. Large lumbar disc herniations at  L4-L5 AND L5-S1,.Has a paracentral herniation with neuroforaminal compression.

In reality, the lumbar MRI of J.M. taken on April 6, 2020 showed a completely unremarkable L4-L5.  While the MRI claimed to find a herniation at L5-S1, it made no mention of any foraminal narrowing.  One of the main findings of this MRI was that J.M. has scoliosis.  Florida Anesthesiology failed to acknowledge or address that diagnosis at all.  Instead, Florida Anesthesiology used these fabricated findings to bill for more than $92,000 of injections, RFAs, and PDDs over a period of just five (5) days in May 2020.

    e.    Patient K.C. (Claim No. 0656731700) on April 25, 2022:

injections were successful in relieving his pain short term. Large lumbar disc herniations at  L4-L5 AND L5-S1,.Has a paracentral herniation with neuroforaminal compression.

The actual report of the MRI taken March 12, 2022 showed no lumbar herniations whatsoever and specifically stated there was "[n]o evidence of vertebral or disc injury." Florida Anesthesiology nevertheless used this fabricated alleged finding to bill for more than $205,000 of injections, RFAs, and PDDs over a period of just one (1) week in April 2022.

    190.    The defendants also misrepresented radiology results to create the appearance of justification for performing unnecessary RFAs on normal, healthy facet nerves.

191.    Florida Anesthesiology frequently used boilerplate language that included an assertion that "radiological findings" were "consisted with the pre-op diagnosis [of facetogenic pain], supporting this procedure."

192.    This statement was made when there were no such radiological findings, and even when radiological findings directly contradicted the assertion.

193.    For example, Florida Anesthesiology billed for its usual set of five (5) cervical RFAs to patient O.Z. (Claim No. 0669263989) on July 16, 2022 using the above-quoted boilerplate language to create the appearance of medical necessity.

194.    The actual radiological findings from a cervical MRI of O.Z just eleven (11) days prior, on July 5, 2022, stated at every cervical level that "facets appear normal for age."

195.    Similarly, Florida Anesthesiology billed for ten (10) RFAs to patient J.M. (Claim No. 0703287557) on April 1, 2023 and claimed that each set of five (5) RFAs, in the cervical region and in the lumbar, were supported by "radiological findings."

196.    In reality, J.M.'s cervical MRI taken March 8, 2023 found that at each cervical level that "[f]acet joints are normal."

197.    Despite Florida Anesthesiology's representation to the contrary, J.M. had not had any radiological testing of her lumbar spine since the date of her alleged accident.

198.    When J.M. did have a lumbar MRI taken two weeks after Florida Anesthesiology billed for destroying the facet nerves at all five (5) levels of J.M.'s lumbar spine, the MRI found only "mild facet hypertrophy."

C.    **FABRICATED VITAL STATISTICS AND INFLATED PAIN SCORES**

199.    In some instances, Florida Anesthesiology's claims were so wildly incongruous with reality that it appears the patient was not actually ever seen or evaluated.

200.    For example, S.M. (Claim No. 0660976614) was measured as 5'9" and 292 lbs. by one physician on February 21, 2022, and as 5'10" and 290 lbs. by another on April 7, 2022.  On May 7, 2022, Florida Anesthesiology reported that S.M. was 6'1" and 198 lbs.

201.    This clear fabrication might otherwise appear benign, but Florida Anesthesiology also claimed – as purported justification for its predetermined invasive procedures – that S.M. had pain scores of eight (8) and nine (9) out of ten (10) in his cervical and lumbar spine, respectively, but S.M. had been reporting pain scores of only five (5) out of ten (10) to other providers.

202.    As Florida Anesthesiology obviously fabricated S.M.'s vital statistics, the reasonable conclusion to draw is that it also fabricated and exaggerated the patient's alleged pain scores as well.

203.    Similarly, D.H. (Claim No. 0657178190) was recorded by two other providers as 5'8" and 183 lbs. and as 5'9" and 182 lbs., respectively.  In between the time of those two measurements, Florida Anesthesiology recorded that D.H. was 5'3" and 145 lbs.

204.    Florida Anesthesiology also falsely recorded that D.H.'s pain scores were eight (8) and nine (9) out of ten (10) despite the fact that she had described her pain as just five (5) out of ten (10) to her chiropractor just ten (10) days prior.

205.    In yet another example, Florida Anesthesiology recorded that F.J. (Claim No. 0671685717) was 198 lbs. despite three (3) other providers recording him as 355 lbs., 360 lbs., and 368 lbs., respectively.

206.    Florida Anesthesiology also claimed that F.J. had cervical pain that was nine (9) out of ten (10) despite the fact that F.J. had reported his cervical pain as just six (6) only one (1) day prior to a different provider.

## IX.    UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

207.    The defendants' willingness to bill for services not rendered and unlawfully rendered, to improperly refer patients, and to fabricate records demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

208.    The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills for submission to Allstate.

209.    To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

210.    The defendants' treatment violated standards of care in the medical community as services were dangerous, not indicated, redundant, excessive, and repeated without any benefit to patients.

211.    The full extent and pattern of the defendants' misrepresentations regarding the fact, lawfulness, and necessity of the treatment they billed was not known to Allstate until it undertook the investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

212.    The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the chart annexed hereto at Exhibit 1.

213.    All of the bills submitted by the defendants seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

214.    Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money it was induced to pay as a result of the defendants' fraud.

215.    None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate.

A.    REDUNDANT AND INCOMPATIBLE PROCEDURES BILLED ON THE SAME DATE

216.    Much of the purported treatment billed by the defendants was not just medically unnecessary, but also medically inappropriate.

217.    The defendants routinely billed for treatments that were purportedly rendered on the same day despite a complete lack of possible medical justification for performing the procedures concurrently.

218.    For example, the defendants regularly billed for administering ESIs on the same day that it also billed for either RFAs or PDDs.

219.    RFAs are minimally invasive procedures that use a needle-like device to destroy nerves as a treatment for facetogenic pain, which presents as axial pain to the spinal region without radiation to the extremities.

220.    In contrast, ESIs are steroid injections that are used to treat discogenic and radicular pain caused by a pinched nerve in the spine.

221.    RFAs and ESIs should never be performed on the same day as they are intended to treat entirely different sources of pain.

222.    Moreover, even if a patient truly presents with both axial and radicular symptoms, performing these procedures concurrently destroys the diagnostic value of both.

223.    If a patient happens to obtain relief from either of these procedures administered concurrently, there is no way to tell whether it was from the ESI or the RFA, so there is no way to use the treatments to guide future care.

224.    As discussed above, the false medical records created by the defendants used copied and pasted descriptions of patients' symptoms to justify these incompatible procedures, and in so doing they describe those symptoms in contradictory ways.

225.    When the defendants billed for ESIs and RFAs to a patient on the same day and for the same spinal region, they used boilerplate language claiming that the patient's pain was both "discogenic with a radicular component" to justify ESIs and also "facetogenic localized to the site and side" to justify RFAs.

226.    These descriptions are completely contradictory; the first claims that the pain is caused by vertebral disc injury and that it radiates to the limbs, and the second claims that the pain is caused by nerves in the facet joint and does not radiate but rather is contained in one location.

227.    In one example of dramatic but typical overtreatment with these incompatible procedures, Florida Anesthesiology billed for five (5) RFAs and six (6) ESIs to B.G. (Claim No. 0658591458) in just one day on July 18, 2022.

228.    Florida Anesthesiology billed for five (5) RFAs to B.G.'s lumbar spine without any prior diagnostic blocks or other diagnostic testing to confirm that it was destroying the specific nerves causing B.G.'s alleged discomfort.

229.    This scattershot approach of destroying the nerves at every lumbar level shows that Florida Anesthesiology had no idea which, if any, of the nerves were causing B.G.'s discomfort.

230.    Florida Anesthesiology also billed for six (6) ESIs to B.G. on the same day, three (3) in the cervical region and three (3) in the lumbar.

231.    All three (3) of the lumbar levels that Florida Anesthesiology billed for an ESI were also allegedly treated by RFA on the same date, further evidencing that there was no real treatment plan and no attempt to identify the source of this patient's alleged pain before generating charges for invasive procedures.

232.    Moreover, none of this overtreatment had any effect as Florida Anesthesiology reported that B.G. had nearly identical pain scores in both her cervical and lumbar spine just one (1) week later on July 25, 2022.

233.    On that same date of July 25, 2022, Florida Anesthesiology billed for repeating the three (3) failed lumbar ESIs from just a week prior, which was clearly inappropriate in light of their documented futility.

234.    The following are additional representative examples of the defendants inappropriately billing for concurrent RFAs and ESIs:

a.  Florida Anesthesiology billed for ten (10) RFAs to S.M.'s (Claim No. 0660976614) lumbar and cervical spine and six (6) ESIs all on the same day, May 7, 2022.  Most of the alleged ESIs overlapped with the levels allegedly treated by RFA.  The following week, on May 14, 2022, Florida Anesthesiology billed for repeating half of those ESIs and for two (2) PDDs, both of which were on levels that were allegedly treated by RFA just a week prior.

b.  On April 18, 2022, Florida Anesthesiology billed for ten (10) RFAs and six (6) ESIs to M.C. (Claim No. 06631119467), divided between her cervical and lumbar regions.  This was M.C.'s very first appointment with Florida Anesthesiology.

c.  On that same day, April 18, 2022, Florida Anesthesiology billed for the same exact procedures—ten (10) RFAs and six (6) ESIs, same exact spinal levels for all sixteen (16) treatments—to a different Allstate insured, K.C. (Claim No. 0656731700).  It was also her initial visit.

d.  On April 1, 2023, Florida Anesthesiology billed for ten (10) RFAs and six (6) ESIs to patient J.M. (Claim No. 0703287557).  This was despite the fact that, as explained *supra*, MRIs showed that J.M. had normal facet joints.

235.    Florida Anesthesiology also frequently billed for ESIs and one or more PDDs to the same region of the same patient on the same day.

236.    This is wholly inappropriate, as a successful PDD relieves pressure on a herniated disc and nerve and therefore makes the steroid injection unnecessary.

237.    Moreover, a PDD should not even be attempted until less invasive and more proven methods of treatment, such as ESIs, have failed to provide lasting relief.

238.    Any pain relief obtained from the steroids may also mask a failed PDD.

239.    Florida Anesthesiology frequently improperly billed for at least three (3) ESIs on the same date it billed for PDDs to patients, as illustrated by the following representative exemplars:

     a.    On April 22, 2023, Florida Anesthesiology billed for a lumbar PDD and three (3) lumbar ESIs to J.M. (Claim No. 0703287557).  On the same date, it also billed a cervical PDD and three (3) cervical ESIs for a total of two (2) PDDs and six (6) ESIs.  Every level allegedly treated by PDD on that date was also allegedly subject to an ESI.

     b.    Florida Anesthesiology billed for a lumbar PDD to M.S. (Claim No. 0656834892) on June 6, 2022.  On the same day, it also billed for three (3) lumbar ESIs covering the same spinal levels as the PDD.  An MRI showed that M.S. did even have a herniation at L5-S1 (one of the two levels allegedly treated by PDD on this date), despite Florida Anesthesiology falsely recording that she had a large herniation at that level causing neuroforaminal stenosis.

     c.    On January 17, 2022, Florida Anesthesiology billed for a lumbar PDD to patient C.S. (Claim No. 0567790431) on the same day as six (6) ESIs.  Three (3) of those ESIs were also to C.S.'s lumbar spine and overlapped with the level allegedly treated by PDD.

     d.    On February 20, 2021, Florida Anesthesiology billed for a lumbar PDD and three (3) lumbar ESIs overlapping the PDD levels to F.D. (Claim No. 0578246274).

**B.    BILLING FOR UNNECESSARY DISCECTOMIES**

240.    The most expensive procedures billed by Florida Anesthesiology were PDDs, which it billed at $65,000 per spinal region allegedly treated.

241.    For this reason, Florida Anesthesiology aggressively recommended and billed for PDDs to patients even when there was no possible medical necessity for the procedures.

242.    Florida Anesthesiology regularly billed for performing completely unnecessary PDDs to spinal levels that MRIs showed were normal and uninjured.

243.    For example, Florida Anesthesiology billed for PDDs to B.G. (Claim No. 0658591458) on July 25, 2022 at C4-5, C5-6, L4-5, and L5-S1.

244.    Florida Anesthesiology falsely claimed that MRIs showed herniations at all four (4) of these levels with foraminal compression that could cause nerve pain.

245.    In reality, MRIs of B.G. taken on March 23, 2022 showed a completely normal L4-5, and no foraminal compression at C4-5 or C5-6.

246.    These unnecessary PDDs were billed to Allstate at a combined cost of $130,000.

247.    Similarly, Florida Anesthesiology billed for two PDDs in one day to S.M. (Claim No. 0660976614) on May 14, 2022.

248.    These alleged PDDs were to the same levels as those allegedly performed on B.G. (Claim No. 0658591458), namely C4-5, C5-6, L4-5, and L5-S1.

249.    Once again, Florida Anesthesiology misrepresented that there were herniations at all four (4) of these spinal levels and that all four (4) had foraminal compression.

250.    S.M.'s MRI results showed herniations at only two (2) of those levels, made no mention of foraminal compression in any of them, and showed that C4-5 was completely "unremarkable."

251.    Florida Anesthesiology billed for a lumbar PDD to J.M. (Claim No. 0581136264) on May 19, 2020 at L4-5 and L5-S1.

252.    Florida Anesthesiology falsely claimed that there were herniations at both levels with foraminal compression but MRI results showed no foraminal compression at L5-S1 and a completely normal L4-5.

253.    Patient K.C. (Claim No. 0656731700) was allegedly subjected to a two-level lumbar PDD surgery on April 25, 2022 despite the fact that an MRI found no herniations anywhere in her lumbar spine.

254.    Florida Anesthesiology falsely claimed that K.C. had "large lumbar disc herniations at L4-L5 AND L5-S1."

255.    In addition to repeatedly billing for blatantly unnecessary surgery on normal discs, the PDDs billed by the defendants were never medically necessary because they failed to establish the source of patients' pain and failed to attempt less invasive treatments before resorting to this unproven surgical intervention.

256.    In many cases, Florida Anesthesiology billed for purported PDDs at a patient's very first visit.

257.    For example, Florida Anesthesiology billed for an alleged lumbar PDD to V.M. (Claim No. 0652168485) on the day of her "initial visit," May 14, 2022.

258.    V.M. had only two "visits" with Florida Anesthesiology and alleged PDDs were billed on both dates.

259.    The purported PDDs on both dates were to V.M.'s lumbar spine; on the first date to L5-S1 and the second the following month to both L4-5 and L5-S1, with no explanation as to why a repeated surgery to L5-S1 was necessary or appropriate.

260.    Florida Anesthesiology also frequently misrepresented patients' responses to ESIs in order to create the false impression of medical necessity for alleged PDDs.

261.    Seemingly in recognition of the fact that a PDD should never be the first attempted treatment, Florida Anesthesiology often tried to justify them by claiming that prior ESIs were successful in alleviating the patient's pain, but then wore off.

262.    These representations were often clearly contradicted, including by Florida Anesthesiology's own reports.

263.    A successful ESI should afford significant pain relief for months at a time before wearing off.

264.    Before resorting to surgical intervention, patients should have attempted ESIs and conservative management (such as physical therapy) only to have severe pain return.

265.    Often when Florida Anesthesiology claimed that successful ESIs wore off, those ESIs were only given one (1) to three (3) weeks prior, which is not enough time to evaluate their efficacy.

266.    Further, Florida Anesthesiology often falsely declared that ESIs were successful even while reporting that patients' pain levels were the same or higher than they were before the ESIs.

267.    Failed ESIs cannot justify a PDD as an ESI that provides no pain relief or only short-term relief may indicate that the patient's pain has been misdiagnosed and is not caused by a pinched spinal nerve at all.

268.    As one example of PDDs billed despite clearly failed ESIs, Florida Anesthesiology billed for three (3) lumbar ESIs and five (5) lumbar RFAs to patient K.J. (Claim No. 0618298029) on April 19, 2021, at which time K.J.'s pain was reported to be eight (8) out of ten (10).

269.    Just one (1) week later on April 26, 2021, Florida Anesthesiology billed for a lumbar PDD to K.J. despite again reporting back pain of eight (8) out of ten (10), evidence that none of the prior interventions had any impact.

270.    Despite having no improvement in his lumbar pain just one week after allegedly administering three (3) ESIs, Florida Anesthesiology stated "[t]he lumbar radicular pain is

positively relieved from epidural injections only to return.  This justifies doing a Percutaneous Lumbar DISCECTOMY."

271.    Florida Anesthesiology also completely ignored the fact that the five (5) lumbar RFAs also had no effect on K.J.'s reported pain.

272.    In a remarkably similar example, Florida Anesthesiology billed for three (3) lumbar ESIs and five (5) lumbar RFAs to patient I.C. (Claim No. 0578244303) on May 11, 2020.

273.    These were allegedly done to the same exact spinal levels as the purported treatment to K.J.

274.    As with K.J., Florida Anesthesiology billed for a lumbar PDD to I.C. just one week later using the "successful" ESIs as a claimed justification despite recording her lumbar pain as an eight (8) out of ten (10) on both dates and therefore unchanged by either the ESIs or the RFAs.

275.    As another example, on July 11, 2020, Florida Anesthesiology billed for three (3) lumbar ESIs to A.M. (Claim No. 0577427263) and reported his lumbar pain as a six (6) out of ten (10).

276.    Two (2) weeks later, Florida Anesthesiology reported that A.M.'s lumbar pain was rated an eight (8), indicating that it was worsened by the alleged ESIs.

277.    Florida Anesthesiology nevertheless used the same pattern language claiming "successful" ESIs to justify billing for a lumbar PDD on that date.

C.    ABLATIONS BILLED WITHOUT PRIOR DIAGNOSTIC TESTING

278.    Prior to destroying a patient's spinal facet nerves with an RFA, physicians are obliged to make sure they have correctly identified the nerve causing a patient's discomfort by performing a medial branch block or similar diagnostic test.

279.     These tests aim to temporarily numb a nerve to determine whether that provides the expected pain relief.

280.     Without first performing such diagnostic tests, a physician giving an RFA may be blindly destroying a patient's normal-functioning spinal nerves.

281.     For an RFA to be medically necessary, a patient must experience 80% pain relief from an MBB for a significant period of time in order to confirm that the facet joint nerves that were blocked are the ones causing discomfort.

282.     Florida Anesthesiology routinely billed for RFAs without performing any prior diagnostic testing.

283.     Moreover, Florida Anesthesiology frequently billed for RFAs to five (5) levels of a patient's spine on a single date of service, which is clearly a scattershot approach that is sure to destroy normal and healthy nerves.

284.     There can be no medical justification for regularly destroying facet nerves in groupings of five (5) levels without any prior diagnostic testing; the only reason to perform RFAs in this manner is to bill for as much alleged "treatment" as possible.

285.     In many cases, prior MRIs show that the spinal levels subjected to RFAs by the defendants showed no signs of facet joint injury.

286.     As another representative example (in addition to those addressed with respect to fabricated records above), J.M. (Claim No. 0581136264) had an MRI of his lumbar spine that found scoliosis and a herniation at level L5-S1, but no significant findings at any level that would support a diagnosis of facet pain.

287.     Despite these MRI results, and despite that J.M. had never undergone an MBB by Florida Anesthesiology or any other provider to diagnose whether blocking a specific nerve

alleviated his pain, Florida Anesthesiology billed for RFAs to all five (5) levels of his lumbar spine on May 14, 2020.

288.    If they were performed at all, these RFAs were clearly excessive and almost certainly destroyed healthy nerves.  As with the examples above, Florida Anesthesiology also billed for three (3) ESIs on the same day to J.M.'s lumbar spine, which should never be performed on the same day as the RFAs of the same spinal levels.

289.    Since 2017, Florida Anesthesiology has billed Allstate for more than 500 RFAs and in the same time period has billed for fewer than twenty (20) of the diagnostic injections that are supposed to precede every RFA.

### D.    DANGEROUS AND EXCESSIVE STEROID INJECTIONS

290.    As explained *supra*, Florida Anesthesiology billed for cervical transforaminal ESIs in the prone position, which is nearly impossible and extremely dangerous, making it likely that these injections were never actually performed as billed.

291.    If, however, Florida Anesthesiology did perform any cervical transforaminal ESIs using the steroid Kenalog, which is what Florida Anesthesiology billed for, these injections were medical unnecessary and dangerous.

292.    Kenalog is a particulate steroid that is not approved for ESIs and is especially hazardous for cervical transforaminal ESIs because of a known risk of embolic stroke if inadvertently injected into the vertebral artery.

293.    Aside from the dangers specific to particulate steroids, excessive amounts of any steroids can be harmful to patients and for that reason, the federal government has instituted limits on the number of ESIs that should be provided and medical associations provide guidelines setting similar limits.

294.    Based on widely accepted medical guidelines, the federal government allows, at most, two (2) ESIs in one (1) day and only to one (1) spinal region (and only one (1) ESI per day is allowed if it is transforaminal).

295.    The federal government also limits the total number of ESIs in a year to four (4) sessions per region, each of which could have one or two injections, but also states that two (2) injections in a day should rarely be necessary.

296.    In contrast, Florida Anesthesiology frequently billed for six (6) transforaminal ESIs on a single date of service over two (2) spinal regions.

297.    These were often repeated a second time only weeks later, which exceeds the maximum allowable in an entire year.

298.    This administration of this dangerous amount of steroids was made worse by the fact that they were often billed on the same day as more aggressive procedures such as RFAs and PDDs.

299.    For example, Florida Anesthesiology billed for six (6) ESIs to F.C. (Claim No. 0579342593) on April 18, 2020 and another three (3) just two (2) weeks later on May 2, 2020.

300.    On this second date, Florida Anesthesiology reported that F.C.'s cervical radicular symptoms were gone, but nevertheless billed for repeating the same three (3) ESIs to F.C.'s cervical region.

301.    Similarly, Florida Anesthesiology billed for six (6) ESIs to C.S. (Claim No. 06355695397) on January 10, 2022, and then billed for repeating the same six (6) ESIs just one (1) week later.

302.    The first set of ESIs overlapped with alleged RFAs billed on the same date and the second set of ESIs overlapped with an alleged PDD on the same date.

303.     This number of redundant and contradictory procedures in just a one (1) week time span was grossly excessive and could not have been medically necessary, appropriate, or safe.

## X.    **FRAUDULENT BILLING**

304.     Providers like the defendants have a responsibility to select and submit billing codes that accurately and truthfully identify the services performed and the complexity involved in rendering those services.

305.     The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

306.     All of the medical records, bills, and invoices submitted to Allstate by the defendants contained Current Procedural Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") codes.

307.     Providers subject to the Health Insurance Portability and Accountability Act, as Florida Anesthesiology is, are required to use CPT codes when submitting bills.

308.     By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they utilized.

309.     The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to submit bills have any meanings other than those ascribed by the American Medical Association ("AMA") and CMS, which publish CPT and HCPCS codes, respectively.

310.     Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

311.     Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered and for which they sought payment from Allstate.

312.     Florida Anesthesiology regularly engaged in fraudulent double billing to further inflate its charges.

313.     According to the coding guidelines associated with the CPT and HCPCS codes used, the charges for procedures for which Florida Anesthesiology billed, including injections, RFAs, and PDDs, include services and items ancillary to the procedures, including patient examinations and supplies.

314.     Florida Anesthesiology regularly billed for the alleged services themselves, but also added separate charges for examinations, supplies, and, as discussed above, for endoscopic services that were not done at all.

315.     For example, Florida Anesthesiology regularly billed for surgical trays during these procedures that are only separately billable if the items used were atypical for the procedures, which they never were.

316.     Since 2018, Florida Anesthesiology has billed Allstate more than $59,400 for double-billed "surgical trays," at a cost of $200 per procedure.

317.     In that same time period, Florida Anesthesiology billed more than $125,000 for the Stryker Dekompressors that were the primary tool used in its alleged PDDs, which is another improper double-billed charge.

318.     Allstate is not required to pay Florida Anesthesiology for any separate and additional charges already included in its other bills and is entitled to repayment of the amounts it was induced to pay as a result of Florida Anesthesiology's improper use of CPT and HCPCS codes.

## XI.   <u>EXCESSIVE AND UNREASONABLE CHARGES</u>

319.    The defendants' bills for alleged treatment were excessively high, unreasonable, and bore no relationship to the cost of performing the alleged procedures, which in many cases were not even performed (as detailed above).

320.    "[A]n insurer is not liable for any medical expense to the extent that it is not a reasonable charge for a particular service or if the service is not necessary." <u>Derius v. Allstate Indem. Co.</u>, 723 So. 2d 271, 271 (Fla. 4th DCA 1998).

321.    Thus, the defendants' unreasonable charges were never compensable by Allstate, which they knew at the time the charges were submitted.

322.    As detailed above, the defendants charged these unreasonable amounts in order to further drive up the perceived value of insurance claims.

323.    The amounts of the defendants' charges have no relationship to the cost or value of the services allegedly performed, and they were selected only to maximize the amount of charges to Allstate.

324.    The potential of receiving a windfall to which they were not entitled by charging unreasonable and excessive amounts also motivated the defendants' decision to bill Allstate for treatment not rendered and unnecessary treatment, and was their motivation to resort to fraudulent billing practices as described *supra*.

325.    In each such case, including those described below, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

326.    Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

327.    The defendants' unreasonably high charges are summarized in the following chart, which includes a sampling of their charges for their most commonly billed CPT codes compared to the average CMS payment rates in the Miami region, where Florida Anesthesiology operates:

| CPT Code | Type of Procedure | Typical Charge Submitted to Allstate by Florida Anesthesiology | CMS 2022 Miami Area Maximum Payment Rate | % Markup Over CMS Maximum Charge |
|---|---|---|---|---|
| 62287 | PDD | $65,000 | $705.79[4] | 9,100% |
| 64479 | Cervical ESI, first level | $2,200 | $320.78 | 586% |
| 64480 | Cervical ESI, each additional level | $1,900 | $162.66 | 1,068% |
| 64483 | Lumbar ESI, first level | $2,000 | $297.64 | 572% |
| 64484 | Lumbar ESI, each additional level | $1,385 | $135.54 | 922% |
| 64633 | Cervical RFA, first level | $7,500 | $530.01 | 1,315% |
| 64634 | Cervical RFA, each additional level | $5,000 | $309.75 | 1,514% |
| 64635 | Lumbar RFA, first level | $7,500 | $534.04 | 1,304% |
| 64636 | Lumbar RFA, each additional level | $5,000 | $292.27 | 1,611% |

328.    As this chart demonstrates, the defendants routinely charged anywhere from approximately six (6) times as much as the maximum allowable CMS payment amount in the Miami region, to more than 90 times as much.

---

[4] The specific type of discectomy billed by Florida Anesthesiology is not covered by CMS at all due to the lack of evidence that it provides meaningful relief, but CMS covers other procedures billed under this CPT code.

329.     Unreasonable charges are not compensable under the Florida Motor Vehicle No-Fault Law and Allstate has no obligation to pay the defendants the outrageous amounts billed.

## XII.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.     MISREPRESENTATION BY THE DEFENDANTS

330.     To induce Allstate to pay their claims that were propped up by their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they billed were necessary, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

331.     Every time the defendants submitted bills and medical records to Allstate supporting their claims for insurance benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

332.     There are no less than nine (9) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

   a.   The defendants billed for surgical procedures, ablations, and injections that were not performed at all.

   b.   The defendants billed for procedures that were not medically necessary, but rather were billed to satisfy improper patient referral agreements by which the defendants agreed to generate enormous charges for patients referred by attorneys.

   c.   The defendants created false medical records and false diagnoses to create the illusion of medical necessity for the fraudulent procedures they billed.

   d.   The defendants billed Allstate for unnecessary discectomies on normal discs that were performed, if at all, solely to generate charges for submission to Allstate.

   e.   The defendants billed Allstate for unnecessary ablations on healthy facet nerves that were performed, if at all, solely to generate charges for submission to Allstate.

f.   The defendants subjected their patients to a battery of unnecessary steroid injections that were performed, if at all, solely to generate charges for submission to Allstate.

g.   The defendants billed for multiple, incompatible treatments on the same dates of service to inflate their charges.

h.   The defendants fraudulently double billed charges for supplies used in procedures, such as surgical trays.

i.   The defendants submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

333.   As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

334.   The foregoing facts – billing for services not rendered, falsifying medical records, billing for unnecessary procedures, and using fraudulent billing practices – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

335.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful (to the extent actually rendered at all).

336.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the chart annexed at Exhibit 1.

337.   Thus, each claim for payment (and accompanying medical records) mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful, not reasonable, and not medically necessary.

338.   Through the submission of patient records, invoices, bills, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, and ancillary services for which they billed Allstate.

339.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

340.   As the defendants did not render lawful and reasonably necessary medical treatment, each bill and accompanying documentation mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

341.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

342.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under Florida and federal law.

343.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment and services.

344.    Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

345.    Due to the defendants' material misrepresentations and affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

346.    In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

347.    Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the medical treatment and services billed.

## XIII.   MAIL FRAUD RACKETEERING ACTIVITY

348.    As detailed above, the treatment and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

349.    The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibit 1, was to collect insurance payments under Florida law and Allstate policies of insurance, including inducing Allstate to make payments from which the defendants received a financial benefit in response to demands that were propped up by the defendants' bills for medical services that were not rendered, were not necessary, were not lawfully rendered, and were fraudulently billed.

350.    This objective necessarily required the submission of bills for payment and insurance claims to Allstate.

351.    The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

352.    Documents, medical records, notes, reports, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with all insurance claims referenced throughout this pleading traveled through the U.S. Mail.

353.    Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payment checks.

354.    Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

355.    It was foreseeable to the defendants that submitting bills to personal injury attorneys would trigger mailings in furtherance of the scheme to defraud, including demands for payment mailed to Allstate.

356.    It was foreseeable to the defendants that submitting bills to Allstate, both directly and through their patients' personal injury attorneys, would trigger mailings in furtherance of the scheme, including payment of fraudulent bills via checks mailed by Allstate.

357.    The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

358.    A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 2.

359.     As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via mail related to each exemplar patient discussed in this Complaint.

360.     It was within the ordinary course of business for Florida Anesthesiology and the personal injury attorneys with whom it associated to submit claims for payment to insurance carriers like Allstate through the U.S. Mail.

361.     Moreover, the business of billing for medical treatment and services by the defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via the U.S. Mail.

362.     In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for Florida Anesthesiology.

363.     Florida Anesthesiology, at the direction and with the knowledge of its owner and manager Xavier, continues to submit claims for payment to Allstate and, in some instances, continues to litigate against Allstate seeking to collect on unpaid claims.

364.     Thus, the defendants' commission of mail fraud continues.

365.     As the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were misrepresented and not compensable, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

366.     Allstate reasonably relied on the submissions it received from Florida Anesthesiology, including the representative submissions set out in Exhibit 2 annexed hereto and identified in the representative patient claims above.

## XIV.   **DAMAGES**

367.    With respect to the defendants' breach of the Settlement Agreement, Allstate has been harmed by at least $3,000,000, the amount that the defendants agreed to pay in the event of their breach, but now refuse to pay.

368.    Allstate has also been harmed by the defendants' refusal to comply with their other Settlement Agreement obligations, including to waive outstanding bills and claims for payment and to refrain from any further billing of Allstate or its insureds/claimants until the defendants' payment obligations have been fully satisfied.

369.    Because the value of these obligations is dependent on the defendants' future conduct, and therefore unpredictable, Allstate is entitled to specific performance of these obligations.

370.    As to Allstate's alternative request for relief based on its underlying fraud and unjust enrichment claims, the pattern of conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

371.    Allstate's claim for compensatory damages includes (a) payments made by Allstate directly to Florida Anesthesiology in reliance upon and as a result of the defendants' false representations regarding the fact, lawfulness, and necessity of the treatment for which they directly billed Allstate; and (b) payments made by Allstate to the defendants' patients (from which the defendants also received payment) that were based on the fraudulent, misrepresentation-laden bills and records from the defendants.

372.    Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and its damages continue to accrue, Allstate has been induced to pay

millions of dollars to and for the benefit of the defendants to resolve claims that were falsely inflated by the fraudulent submissions detailed above.

373.     Allstate's damages seek monies paid directly to the defendants or on their behalf by Allstate, and the damages are not derivative of an injury to any other person or entity.  The patients at issue in this Complaint were used as pawns by the defendants and have been victimized by the defendants.  However, the actual target of the defendants' scheme—and the sole party who received fraudulent mailings as itemized in the exemplar patients above and in Exhibit 2—is Allstate.  Allstate alone paid the damages at issue herein.  Thus, injury to Allstate was the intended, direct, and actual result of the defendants' scheme to defraud.  Injury to Allstate was also the reasonably probable consequence of the defendants' actions, as it was in the ordinary course of the defendants' business to collect insurance proceeds.

374.     The defendants' fraudulent conduct discussed above caused Allstate to incur damages by paying claims that otherwise would not have been paid but for the defendants' misrepresentations and improper conduct (as set out in the preceding sections).  Allstate was the target of the defendants' conduct and bills, and Allstate's damages are directly related to and a consequence of the defendants' actions discussed herein.

375.     Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

376.     Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling costs with respect to each defendant.

377.     Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling costs with respect to each defendant.

## XV.     CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### Against All Defendants

378.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 33 set forth above as if fully set forth herein.

379.     On December 8, 2023, Allstate entered into the Settlement Agreement with Xavier and Florida Anesthesiology fully resolving the dispute between them as described herein.

380.     A material term of the Settlement Agreement is that the defendants must pay to Allstate $2,500,000, including an initial payment of $1,000,000.

381.     The defendants have failed to pay any amount to Allstate, and are therefore in material breach of the Settlement Agreement.

382.     The defendants have advised Allstate that they do not intend to cure their material breach and do not intend to fulfill their payment obligations to Allstate.  The defendants are therefore in declaratory breach of the Settlement Agreement.

383.     A material term of the Settlement Agreement is that the defendants must pay to Allstate $3,000,000 if the defendants fail to pay the $2,500,000.

384.     Because the defendants failed to pay $2,500,000 as agreed upon via the Settlement Agreement, the defendants now owe Allstate $3,000,000.

385.     Accordingly, Allstate has been damaged by the defendants' material breach of the Settlement Agreement in an amount equal to at least $3,000,000.

386.     In the alternative, the defendants have committed anticipatory breach of contract as it relates to the payment term of the Settlement Agreement because they have stated unequivocally and absolutely that they will not comply with the terms of the Settlement Agreement, as confirmed by numerous telephone conversations between counsel for Allstate and counsel for the defendants on December 19, 2023 and the days thereafter during which counsel for the defendants apologized but stated numerous times that he was instructed by the defendants to convey that the defendants will not honor their Settlement Agreement obligations.  In fact, the defendants have not honored the Settlement Agreement requirements, including not tendering any payment to Allstate.  Thus, by both verbal statements and actual (lack of) action, the defendants have confirmed that they have repudiated their payment duties under the Settlement Agreement, have not met their payment obligations and duties under the Settlement Agreement, and have no intention to meet their payment obligations and duties under the Settlement Agreement.

387.     As material terms of the Settlement Agreement, the defendants also agreed to waive all outstanding bills and claims for payment, and to refrain from billing Allstate or its insureds until the defendants' payment obligations to Allstate pursuant to the Settlement Agreement are fully satisfied.

388.     Allstate is entitled to specific enforcement of the Settlement Agreement because there is clear, definite, and certain evidence that the defendants intended to and did enter into the Settlement Agreement.

389.     Allstate does not have an adequate remedy at law to replace the defendants' obligations to waive all outstanding bills and claims for payment, and to refrain from billing Allstate or its insureds until the defendants' payment obligations to Allstate pursuant to the

Settlement Agreement are fully satisfied, because the value of these obligations depend upon the defendants' future conduct that cannot be ascertained in advance.

390.    Justice requires that the defendants be bound by their agreed-upon obligations under the Settlement Agreement and prohibited from attempting to collect on their present and future claims for payment in accordance with the terms of the Settlement Agreement.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Florida Anesthesiology Enterprise)**
**Against Ravi Xavier, M.D.**

391.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

392.    Florida Anesthesiology constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

393.    In connection with the claims identified in the within Complaint, Xavier intentionally caused to be prepared and mailed false medical documentation by or on behalf of Florida Anesthesiology, or should have reasonably foreseen that the mailing of such false medical documentation by or on behalf of Florida Anesthesiology would occur, in furtherance of the defendants' scheme to defraud.

394.    Xavier knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 2.

395.    As documented above, Xavier repeatedly and intentionally submitted, caused to be submitted and knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Florida Anesthesiology, which Xavier knew would be billed by Florida Anesthesiology, in order to collect payment from Allstate.

396.    Xavier owned, managed, and controlled Florida Anesthesiology and implemented procedures and policies in order to perpetrate the scheme described herein.

397.    Xavier submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of medical necessity and permitted Florida Anesthesiology to continue billing for unlawful and medically unnecessary treatment, as well as treatment that was not rendered at all.

398.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts for the benefit of Xavier that would not otherwise have been paid.

399.    Xavier's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

400.    By virtue of Xavier's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from Xavier three times the damages sustained by reason of the claims submitted, caused to be submitted, and known to be submitted by Xavier, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT III**</u>
**VIOLATION OF Fla. Stat. § 772.103(3)**
**(Florida Anesthesiology Enterprise)**
**Against Ravi Xavier, M.D.**

401.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

402.    Florida Anesthesiology constitutes an enterprise, as defined in Fla. Stat. § 772.103(3), that engaged in activities that constitute a pattern of criminal activity.

403.    In connection with the claims identified in the within Complaint, Xavier intentionally caused to be prepared and mailed false medical documentation, and knew that such

false medical documentation would be mailed in the ordinary course of Florida Anesthesiology's business, or should have reasonably foreseen that the mailing of such false medical documentation by Florida Anesthesiology would occur, in furtherance of the defendants' scheme to defraud.

404.    As documented above, Xavier repeatedly and intentionally submitted, caused to be submitted, and knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Florida Anesthesiology, which Xavier knew would be billed by Florida Anesthesiology, in order to collect payment from Allstate.

405.    Xavier owned, managed, and controlled Florida Anesthesiology and implemented procedures and policies in order to perpetrate the scheme described herein.

406.    Xavier submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of medical necessity and permitted Florida Anesthesiology to continue billing for unlawful and medically unnecessary treatment, as well as treatment that was not rendered at all.

407.    These knowing and intentional acts constitute a pattern of criminal activity, and said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

408.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts for the benefit of Xavier that would not otherwise have been paid.

409.    Xavier's conduct in violation of Fla. Stat. § 772.103(3) was the direct and proximate cause of Allstate's injury.

410.    By virtue of Xavier's violation of Fla. Stat. § 772.103(3), Allstate is entitled to recover from Xavier three times the damages sustained by reason of the claims submitted, caused

to be submitted, or known to be submitted by Xavier, together with the costs of suit, including reasonable attorney's fees and court costs pursuant to Fla. Stat. § 772.104.

### COUNT IV
### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. §§ 501.201-501.213)
### Against All Defendants

411.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

412.    Florida Anesthesiology and Xavier engaged in unfair and deceptive acts and practices in the conduct of trade and commerce in violation of FDUTPA in relation to each insurance claim at issue herein.  *See* Fla. Stat. §§ 501.201-501.213.

413.    The defendants' deceptive acts and practices included knowingly billing for services that were not performed, that were a result of improper patient referrals, that were documented by falsified and fabricated records, and that were medically unnecessary, and concealing the same from Allstate, all of which constitute false, incomplete, and misleading statements made while "knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" in violation of the Florida Insurance Fraud Statute.  Fla. Stat. § 817.234(1)(a)(1).

414.    Florida Statutes § 626.9541(1)(u) also expressly defines knowingly causing to be presented to any insurer a false claim for payment as an unfair or deceptive act or practice.

415.    The defendants' violations of Fla. Stat. § 817.234 and Fla. Stat. § 626.9541 are *per se* violations of the FDUTPA.

416.    Accordingly, this conduct is *per se* unfair or deceptive under FDUTPA.  *See* Fla. Stat. § 501.204(1).

417.     The defendants' above-described conduct was deceptive as it was likely to, and did in fact, mislead Allstate, while acting reasonably under the circumstances, to Allstate's detriment by misrepresenting the fact, lawfulness, and medical necessity of the charges.

418.     The defendants' above-described conduct was unfair as it was contrary to public policy, unconscionable, immoral, unethical, oppressive, and unscrupulous, and produced no benefits to consumers or competition.

419.     As a result of the defendants' deceptive and unfair practices, Allstate has been injured in its business and property and the defendants are liable to Allstate for damages and an award of attorney's fees pursuant to Fla. Stat. § 501.2105(1).

**COUNT V**
**COMMON LAW FRAUD**
**Against All Defendants**

420.     Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

421.     The scheme to defraud perpetrated by Florida Anesthesiology and Xavier was dependent upon a succession of material misrepresentations of fact that the defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

422.     The misrepresentations of fact made by the defendants include, but are not limited to, those material misrepresentations discussed in section XII, *supra*.

423.     The defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

424.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment would be submitted to Allstate.

425.    The defendants' misrepresentations were known by them to be false and were made for the purpose of inducing Allstate to make payments for claims that were not compensable under Florida and federal law.

426.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring costs related to the adjustment and processing of claims submitted by and on behalf of the defendants.

427.    As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

<u>**COUNT VI**</u>
**UNJUST ENRICHMENT**
**Against All Defendants**

428.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

429.    Defendants Florida Anesthesiology and Xavier submitted, caused to be submitted, and benefited from bills and claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

430.    Allstate's payments constitute a benefit that the defendants aggressively sought and voluntarily accepted.

431.    The defendants wrongfully obtained payments from Allstate, and benefited from payments they induced Allstate to make, through the fraudulent scheme detailed herein.

432.    The defendants have been unjustly enriched by receipt of these payments wrongfully obtained directly or indirectly from Allstate.

433.    The defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

434.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 21 and 34 through 377 set forth above as if fully set forth herein.

435.    Defendants Florida Anesthesiology and Xavier routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

436.    The defendants also billed for services not rendered.

437.    Pursuant to Florida law, Allstate is only liable to pay "reasonable expenses" for "medically necessary" services.  *See* Fla. Stat. § 627.736(1)(a).  In addition, an insurer is not required to pay a claim or charge for services or treatment that were not lawful at the time rendered. *See* Fla. Stat. § 627.736(5)(b)(1)(b)

438.    Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

439.    The defendants continue to submit and cause to be submitted insurance claims for unnecessary and unlawfully rendered medical services to Allstate, and other insurance claims remain pending with Allstate.

440.    The defendants will continue to submit and cause to be submitted insurance claims to Allstate absent a declaration by this Court that their activities are unlawful and that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by the defendants for any or all of the reasons set out in the within Complaint.

441.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the defendants billed for fraudulent, unnecessary, and unlawful treatment that is not compensable under Florida law or an Allstate policy of insurance.

442.    Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the defendants were engaged in a fraudulent scheme whereby they billed for fraudulent, unnecessary, and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

443.    As such, the defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the defendants cannot seek payment from Allstate for benefits under Florida law, any Allstate policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint.

444.    Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the defendants cannot balance bill or otherwise seek payment from

any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint.

## XVI.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**BREACH OF CONTRACT**
**Against All Defendants**

(a)      ENTER the agreed/pocket judgment agreed to as a term of the Settlement Agreement as a final judgment and ORDER Florida Anesthesiology & Pain Clinic, P.A. and Ravi Xavier, M.D., jointly and severally, to pay Allstate the amount of $3,000,000;

(b)      AWARD Allstate its contractual damages of $3,000,000;

(c)      ORDER that the non-payment terms of the Settlement Agreement, including but not limited to the waiver and billing prohibition terms, shall be specifically performed and enforced and that Florida Anesthesiology & Pain Clinic, P.A. and Ravi Xavier, M.D., jointly and severally, must immediately and completely perform and abide by the same; and

(d)      GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Florida Anesthesiology Enterprise)**
**Against Ravi Xavier, M.D.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATION OF Fla. Stat. § 772.103(3)**
**(Florida Anesthesiology Enterprise)**
**Against Ravi Xavier, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to Fla. Stat. § 772.104, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. §§ 501.201-501.213)**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate all damages pursuant to Fla. Stat. §§ 501.201-501.213, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the deceptive and unfair conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT V**
**COMMON LAW FRAUD**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

**COUNT VI**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

**COUNT VII**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Florida Anesthesiology & Pain Clinic, P.A. and Ravi Xavier, M.D., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Florida Anesthesiology & Pain Clinic, P.A. and Ravi Xavier, M.D., jointly and severally, cannot seek payment from Allstate pursuant to Florida law, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint;

(c)     DECLARE that Florida Anesthesiology & Pain Clinic, P.A. and Ravi Xavier, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under

an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint; and

       (d)     GRANT such other relief as this Court deems just and appropriate under Florida law and the principles of equity.

## XVII.     <u>DEMAND FOR JURY TRIAL</u>

       The plaintiffs hereby demand a trial by jury on all claims.

               Respectfully submitted,

               */s/ Marc Schechter*
               _____

**Marc Schechter, Esquire**
Florida Bar No.: 183105
Attorney E-Mail Address:
mschechter@lawdrive.com
Robinson, Pecaro & Mier, P.A.
510 Shotgun Road, Suite 404
Sunrise, Florida 33326-1956
(954) 252-7197 – telephone
(954) 252-7199 – facsimile
Attorney for Plaintiffs Allstate

**Andrew H. DeNinno, Esquire**
*Pro Hac Vice Pending*
Attorney E-Mail Address:
adeninno@ktmpc.com
KTM
350 Granite Street, Suite 2204
Braintree, Massachusetts 02184
(617) 770-2214 – telephone
(617) 774-1714 – facsimile
Attorney for Plaintiffs Allstate

Dated: December 28, 2023